IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| TERRENCE A. HARVEY, | ) | |
|    Plaintiff, | ) | Civil Action No. 7:17-cv-00113 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| J. HALL, et al., | ) | By:   Joel C. Hoppe |
|    Defendants. | ) | United States Magistrate Judge |

      Plaintiff Terrence Harvey, a Virginia prisoner appearing pro se, filed this suit under 42 U.S.C. § 1983, asserting that Defendants Sergeant Hall and Officer Blankenbeckler violated Harvey's Eighth Amendment rights while he was housed at Red Onion State Prison ("ROSP"). Specifically, Harvey alleges that at around 3:30 a.m. on June 10, 2016, Blankenbeckler repeatedly slammed Harvey's hand in the tray slot on the door of his segregation cell when Harvey asked a question about that morning's breakfast and that Hall refused to send Harvey to the prison's Medical Department even after seeing that his hand was bleeding. Harvey also asserts state law assault and battery claims against Blankenbeckler based on the same underlying facts.

      The matter is now before the Court on Harvey's "Motion for Sanctions Under Fed. R. Civ. P. 37(e) for Spoliation of Evidence," ECF No. 43, which is before me by referral under 28 U.S.C. § 636 (b)(1)(A). Harvey seeks sanctions against Defendants for failing to preserve rapid eye video footage from his housing unit, which Harvey claims would have shown Blankenbeckler "slamming [his] hand in the tray slot repeatedly" and Hall "denying [him] medical attention" when he came to Harvey's cell that morning. Pl.'s Mot. 9. Defendants respond that a fixed rapid eye camera was installed "in front of [Harvey's] housing unit" on June 10, but that the "video was recorded over" because ROSP's Intelligence Unit was not asked to retain it

1

for Harvey within ninety days of the incident. Aff. of J. Fannin ¶¶ 5–6, ECF No. 37-1. Having considered the parties' arguments and all pertinent materials, I conclude that, although the video should have been retained and was lost because prison officials failed to take reasonable measures to preserve it, Harvey has not shown prejudice from loss of the video, as necessary for the court to impose sanctions or curative measures under Rule 37(e) of the Federal Rules of Civil Procedure.

I. The Legal Framework

Spoliation is "the destruction or material alteration of evidence or . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). A party seeking spoliation sanctions must show that spoliation occurred and that the requested sanctions are warranted under governing law. *Blue Sky Travel & Tours, LLC v. Al Tayyar*, 606 F. App'x 689, 698 (4th Cir. 2015); *Sampson v. City of Cambridge*, 251 F.R.D. 172, 181 (D. Md. 2008) (citing *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450–51 (4th Cir. 2004)). Rule 37(e) provides the legal framework for evaluating spoliation claims involving otherwise discoverable electronically stored information ("ESI"), including recorded video or audio, not preserved for litigation. *See Jenkins v. Woody*, No. 3:15cv355, 2017 WL 362475, at *12, *14 (E.D. Va. Jan. 21, 2017). Under this Rule,

> a movant must satisfy four threshold requirements before a court decides if any spoliation sanction is appropriate: (1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery.

*Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018).

Rule 37(e)'s threshold elements mirror the traditional three-part test for spoliation, which requires the moving to party to show:

2

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind"; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Walker v. Owens*, No. 7:13cv425, 2016 WL 320998, at *2 n.3 (W.D. Va. Jan. 26, 2016) (quoting *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009)); *see Steves & Sons*, 327 F.R.D. at 104 ("This analysis is similar to the Rule 37(e) framework, as it asks whether the responsible party had a duty to preserve, and breached that duty by failing to take reasonable steps to preserve."). "[A]ny level of fault, whether it is bad faith, willfulness, gross negligence, or ordinary negligence"[1] satisfies the culpability element, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 497 (E.D. Va. 2011), whereas "the nuanced, fact-specific differences among these states of mind become significant in determining" any appropriate remedy or sanction for spoliation, *Victor Stanley*, 269 F.R.D. at 529. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).

## II. Background

On June 10, 2016, Blankenbeckler was serving Ramadan breakfast trays in the C-2 segregation housing unit, where Harvey was housed in cell C-215. *See* Aff. of B. Blankenbeckler

---

[1] Negligence is a lack of due care, the failure to exercise the level of care expected of a reasonably prudent person acting under like circumstances." *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liability Litig.*, 299 F.R.D. 502, 519 (S.D. W. Va. 2014). "Gross negligence is the same as ordinary negligence, except in degree." *Id.* "In contrast, willfulness and bad faith require 'intentional, purposeful, or deliberate conduct,'" *id.* (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 530 (D. Md. 2010)), undertaken with the knowledge that the evidence was relevant to some issue in the anticipated litigation, *see Hodge*, 360 F.3d at 450. "The fundamental element of bad faith spoliation is advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice." *In re Ethicon*, 299 F.R.D. at 519 (quoting *Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1326 (Fed. Cir. 2011)). Willfulness requires a slightly lesser showing "that the actor intended to destroy the evidence," *Victor Stanley*, 269 F.R.D. at 530, when he or she "knew the evidence was relevant to some issue" in anticipated litigation, *see Hodge*, 360 F.3d at 450.

3

¶ 4, ECF No. 16-1; Pl.'s Mot. Ex. A, ECF No. 43-1, at 2. Inmates' meal trays were prepared in ROSP's food services department, covered with a lid or "placed into a feeding box," and loaded onto a cart to be transported to the housing units. Pl.'s Mot. Ex. B, ECF No. 43-1, at 3; *see also* Blankenbeckler Aff. ¶ 4. When the officer arrived at the inmate's cell, he "remove[d] the lid from the tray and place[d] it on the tray slot or in the tray slot safety box." Pl.'s Mot. Ex. B, at 3.

Here, Blankenbeckler opened the tray slot on Harvey's segregation cell door, "set the uncovered tray inside of the tray slot box," and "opened the sliding door" so Harvey could take the tray. Blankenbeckler Aff. ¶ 4; *see* Verified Compl. ¶ 9 ("Blankenbeckler served Plaintiff Harvey his Ramadan breakfast tray through the secure tray slot box . . . ."), ECF No. 1. Harvey attests that he saw "only one boiled egg on his tray and that it was missing two" eggs, Verified Compl. ¶ 9, while Blankenbeckler swears that he "observed . . . Harvey's tray contained three eggs," Blankenbeckler Aff. ¶ 4. Harvey recalls that Blankenbeckler noticed the missing eggs and told Harvey to "stop bitching and just take the food tray." Verified Compl. ¶ 10.

Blankenbeckler "attempted to close the sliding door" on the safety box, but something was in the way. Blankenbeckler Aff. ¶ 4; *see* Verified Compl. ¶¶ 11–12. Blankenbeckler claims it was a small paperback book. Blankenbeckler Aff. ¶ 4. Harvey alleges that it was his left hand, which he put "in the secure tray slot opening to prevent the inmate access door from being closed." Verified Compl. ¶ 11. According to Harvey, Blankenbeckler "immediately" started "repeatedly slamming [Harvey's] left hand in the inmate access door of the tray slot box over and over again," causing "a deep laceration to [his] outer left palm." *Id.* ¶¶ 14–15. Blankenbeckler asserts that he "attempted several times to secure the tray slot[,] but was unable to close it due to the book" blocking the track. Blankenbeckler Aff. ¶ 4. Harvey attests that he showed the officer his "actively bleeding" hand through the cell window, Verified Compl. ¶ 16, whereas

4

Blankenbeckler contends there "was no incident or use of force requiring Harvey to be checked by medical staff," Blankenbeckler Aff. ¶ 6.

Sargent Hall does not remember interacting with Harvey on June 10, 2016. Aff. of J. Hall ¶ 4, ECF No. 16-2. He does not dispute, however, that the "log entry made by the control room officers indicates" that at 4:35 a.m. Hall and another officer "brought paperwork to C-2 pod" for Harvey, which was placed on his cell door while "Harvey was holding his food tray." *See id.* Hall also purportedly told the ROSP officials who investigated Harvey's grievance in the summer of 2016 that "when he was notified of the incident he spoke to [Harvey] at [his] cell door," at which time Harvey accepted his food tray and Hall "noted there was no injury done to [his] hand." Pl.'s Mot. Ex. B, at 3. On June 15, a nurse observed an "inch long scab" on Harvey's left hand, which Harvey explained was from cutting "it on [a] rusty tray box." Verified Compl. Ex. B, ECF No. 1-1, at 3. The nurse referred Harvey to the prison doctor, who administered an overdue tetanus shot. *See* Aff. of J. Bledsoe ¶ 6, ECF No. 16-3; Verified Compl. Ex. C, ECF No. 1-1, at 4.

On July 12, 2016, Harvey submitted a regular grievance explaining what had happened to him in the C2 pod on June 10. He specifically asked ROSP officials to save "the video (rapid eye) footage . . . from 6/10/16 between the hours of 3:30–5:30 a.m." Verified Compl. Ex. E, ECF No. 1-1, at 6 (spelling and punctuation corrected). Former ROSP corrections counselor A. Duncan drafted a Level I response, *see* Aff. of A. Duncan ¶ 3, ECF No. 37-2, concluding that there was "no evidence to support [Harvey's] allegations," Verified Compl. Ex. F, ECF No. 1-1, at 7. Her response did not mention surveillance video, *id.*, and Duncan "do[es] not recall whether [she] viewed video footage" when investigating these allegations, Duncan Aff. ¶ 3. Assistant Warden Artrip signed the Level I Response on August 16, 2016. Duncan Aff. ¶ 3.

Harvey immediately appealed this response, noting that he had asked "for the rapid eye footage to be saved from 6/10/16 between 3:30 & 5:30 a.m. as [the] 866.1 policy states [prisoners] are to do." Verified Compl. Ex. F, at 8. At that time, VDOC Operating Procedure 866.1 instructed that "[i]f a grievance is received that references a specific audio or video recording, a copy of the recording shall be made and maintained at the facility" for at least three years. Pl.'s Mot. Ex. E, ECF No. 43-1, at 6–7; *see Muhammad v. Mathena*, No. 7:14cv529, 2016 WL 8116155, at *3 (W.D. Va. Dec. 12, 2016) (noting that this language was added in September 2014). According to ROSP Institutional Investigator Joe Fannin, "[w]hen an offender writes a grievance in which he requests the retention of video, a copy of the grievance [would be] sent to Intelligence Staff," who are the only ROSP officials authorized to save video clips from the rapid eye surveillance system. Aff. of J. Fannin ¶¶ 4, 7, ECF No. 37-1. If intelligence staff need more specific information about the "dates and times of the requested video," they may contact the prisoner for that information. *Id.* ¶ 4. ROSP did "not have the storage capacity or manpower to record hours of video for retention," but officials could save and store "short clips of video." *Id.* In 2016, ROSP's "rapid eye system routinely recorded over video" that was more than ninety days old. *Id.* ¶¶ 7–8. Duncan cannot explain "why the June 10, 2016 video requested by Harvey in his grievance was not retained," but she "do[es] not recall requesting that the Red Onion Intelligence Unit clip and save the surveillance video." Duncan Aff. ¶ 4.

Fannin attests that "[r]apid eye cameras generally do not provide a view into the cells" at ROSP because "the cell doors are solid with a narrow vertical shaped window [that] does not allow a full view into the cell." Fannin Aff. ¶ 3. The video cameras could "capture a view of activities in the housing unit including offender and staff movement," but they did not record audio. *Id.* On June 10, 2016, the rapid eye camera that would have shown Harvey's cell, C-215,

6

"was a fixed camera [at] the front of the housing unit." *Id.* ¶ 6. "While the camera footage would have likely shown the officer standing in front of the cell, it would not have been possible to see the . . . tray slot or the slider on the cell door." *Id.* "[T]he cell door would have also been closed" during meal service, "so [Harvey] could not be seen inside the cell except through the vertical window on the cell door." *Id.*

In September 2018, Fannin informed Harvey that "there was no video saved" for him from June 10, 2016, because he "never received [any] paperwork from [Harvey] requesting this video be saved." Fannin Aff. Encl. A, ECF No. 37-1; *see also* Fannin Aff. ¶ 5. Fannin also "did not receive a notification from the Institutional Grievance Office regarding retention of the June 10, 2016 video for Harvey." Fannin Aff. ¶ 5. In any event, "more than 90 days had passed and the video was recorded over," *id.* ¶ 8, before Defendants Blankenbeckler and Hall were served with Harvey's § 1983 complaint in June 2017, *see* Defs.' Resp. in Opp'n 7, ECF No. 51. Thus, "Defendants cannot produce the requested footage." Defs.' Resp. to Court Order 3, ECF No. 37.

III. Discussion

The parties agree that the rapid eye video footage was ESI that has been "lost" and cannot be "restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). They disagree whether the footage "should have been preserved in the anticipation . . . of litigation," whether it was lost "because a party failed to take reasonable steps to preserve it," and, if so, whether sanctions or curative measures are appropriate under Rule 37(e). *Id.*

Harvey claims the video should have been preserved because he specifically asked ROSP officials to save it in accordance with the VDOC's retention policy and the video was "the best evidence, both neutral and objective, of the actions" of Defendants Blankenbeckler and Hall, respectively, "slamming [Harvey's] hand in the tray slot repeatedly and then denying [him]

7

medical attention." Pl.'s Mot. 7, 9. Defendants respond that the video's lack of audio and "grainy, frame-by-frame images," typical of rapid-eye camera footage, would not have reliably depicted these alleged events, Defs.' Resp. in Opp'n 9, and, even if it had, the Defendant correctional officers "did not have the duty or ability to preserve the video footage" because they could not access the electronic storage system, *id.* at 5. *See id.* at 5–10. Defendants also cite their lack of direct involvement in the prison grievance process to explain why they could not have "known that the evidence was relevant to some issue in [an] anticipated case, and thereafter willfully engaged in conduct resulting it the evidence's loss or destruction." *Id.* at 8 (quoting *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013)).

A.  *Duty to Preserve*

"The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591. "The broad contours of the duty to preserve are relatively clear," *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003), and flow logically from a civil litigant's obligation to disclose and produce discoverable material relevant to any party's claim or defense after a complaint is filed, *E.I. du Pont de Nemours*, 803 F. Supp. 2d at 496. *See generally* Fed. R. Civ. P. 26(b)(1), 33(a)(2), 34(a)(1), 37(d)–(e). Once this duty attaches, a party must "suspend its routine . . . retention/destruction policy and implement a 'litigation hold' to ensure the preservation," *Goodman*, 632 F. Supp. 2d at 511, of those materials that the party knows or should know are, "or could be, relevant to the parties' dispute," *Blue Sky Travel*, 606 F. App'x at 698 (citing *Turner*, 736 F.3d at 282). Any subsequent "destruction of material evidence within the party's control is a breach of th[is] duty." *In re Ethicon*, 299 F.R.D. at 518.

The VDOC has established a policy that the preservation of audio/video evidence is of "special concern[] during the intake" of prisoners' regular grievances. OP 866.1 § VI(B)(7)(c). "If a grievance *references* a specific audio or video recording, a copy of the recording *shall be made* and maintained at the facility." *Id.* (emphasis added). In July 2016, an inmate did not have to send his grievance to a special investigation unit specifically asking for the recording to be preserved, *id.* § VI(A)(2)(b), and it does not appear that individual prison officials had broad discretion whether to copy and save the recording, *id.* § VI(B)(7)(c). *See Muhammad*, 2016 WL 8116155, at *3, *5. VDOC's grievance retention policy also mandated that "[c]opies of grievances . . . and audio/video records, if applicable will be maintained at the unit for a minimum of three years following final disposition of the grievance," or longer if the matter is "known to be under investigation or litigation." OP 866.1 § VIII(A)(2).

There is no dispute that Harvey's regular grievance expressly "referenced" a specific video recording from the C-2 pod rapid eye camera and asked that a two-hour clip from that recording be saved in accordance with OP 866.1. Verified Compl. Exs. E, F. Harvey's grievance was accepted in the Warden's office on July 26, 2016, *id.* Ex. E, and, according to Investigator Fannin's testimony, a copy should have been sent to ROSP's Intelligence Staff, *see* Fannin Aff. ¶ 4. Counselor Duncan drafted the Level I response to Harvey's grievance, but she does not remember asking the Intelligence Unit to "clip and save" a copy of the requested recording. Duncan Aff. ¶ 4. On this record, I find that ROSP officials' duty preserve this potentially relevant video evidence arose, at the latest, when Assistant Warden Artip, who was a high-ranking official at ROSP, signed the Level I response on August 16, 2016. *See Blue Sky Travel*, 606 F. App'x at 698; *In re Ethicon*, 299 F.R.D. at 518.

B.  *Culpability & Attribution of Fault*

Once the duty to preserve the footage attached, it was up to the VDOC officials who reviewed Harvey's grievance materials, including respondent Counselor Duncan, to take whatever steps were reasonably necessary to ensure that "a copy of the recording [was] made and maintained" at ROSP. *See* OP 866.1 § VI(B)(7)(c). The combined weight of the evidence—Harvey's requests in a written grievance and appeal to save a specific clip of video that could show an officer's use of excessive physical force against him, the respondents' apparent indifference to those requests, and the established presence of a policy instructing VDOC officials to honor such requests—supports a conclusion that the video would have been retained for litigation had ROSP officials exercised "due care" in following their own policy, as would be "expected of a reasonably prudent person acting under like circumstances," *In re Ethicon*, 299 F.R.D. at 519. Their failure to do so was negligent—perhaps even grossly negligent given the clear instructions in place for copying and saving this type of evidence.[2] *See Ackerson v. Rector & Visitors of Univ. of Va.*, No. 3:17cv11, 2018 WL 3097346, at *9 (W.D. Va. April 11, 2018), *adopted by* 2018 WL 3097334 (W.D. Va. June 22, 2018); *In re Ethicon*, 299 F.R.D. at 521; *Sampson*, 251 F.R.D. at 181; *Zubulake*, 220 F.R.D. at 220.

The next question is who, if anyone, should the Court hold responsible for the officials' negligent conduct resulting in the loss of this potentially relevant evidence. There is no legal basis for imposing sanctions against Counselor Duncan or Assistant Warden Artip, as neither is "a party" to this lawsuit. Fed. R. Civ. P. 37(e); *see Bolling v. Montgomery Ward & Co.*, 930 F. Supp. 234, 238 (W.D. Va. 1996). Instead, if any remedy is to be had, it must be against the

---

[2] There is no evidence that any ROSP official intentionally or purposefully failed to preserve the video recording when he or she "*knew* the evidence was relevant to some issue" in anticipated litigation, *Hodge*, 360 F.3d at 450 (emphasis added), much less that any official wanted to deny Harvey access to that evidence if he eventually filed suit, Fed. R. Civ. P. 37(e)(2). *See Muhammad*, 2016 WL 8116155, at *6 (prison officials' testimony that they did not recollect "the contents of the video" undermined any suggestion that they acted willfully or in bad faith despite plaintiff's multiple requests to save the recording).

Defendants, Correctional Officer Blankenbeckler and Sergeant Hall. *Muhammad*, 2016 WL 8116155, at *7. Fannin testified that "correctional officers and sergeants do not have access to Red Onion's video surveillance system," Fannin Aff. ¶ 7, and Harvey has not pointed to any evidence suggesting that Blankenbeckler or Hall were personally involved in the video being lost. *See Muhammad*, 2016 WL 8116155, at *7.

Harvey asserts that Defendants can be held responsible for their coworkers' negligence because "standard principles of agency law apply to spoliation" claims. Pl.'s Mot. 10. The key players in this case do not fit neatly within the ordinary understanding of an agency relationship, however, because there is no indication that Assistant Warden Artip and Counselor Duncan acted subject to Defendants' control. *See Muhammad*, 2016 WL 8116155, at *7 (describing a similar relationship between the defendant correctional officers and the administrative officials who negligently failed to preserve requested surveillance video). That said, I have previously rejected defendant prison officials' position that a court should not impute the wrongdoing of other prison employees to them, absent a conventional agency relationship. *Id*. at *7–8, *adopted by* 2017 WL 395225 (W.D. Va. Jan. 27, 2017). Adopting such a rule "would present a dilemma in the context of prison litigation, . . . where the responsibility for preserving evidence may be spread out among multiple officials within an institution and where the institutions themselves are typically immune from suit." *Id.* at *7 (citing *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012)).

As in *Muhammad*, respondents and Defendants here were all acting in their capacities as "employees of either ROSP or VDOC, the institutions that ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners." *Id.* at *7–8 (citing *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1106, 1110–11 (D. Ariz. 2014)). Moreover, because the Court finds the current record does not reasonably support a finding that Harvey suffered any prejudice from loss of the

video, Fed. R. Civ. P. 37(e)(1), Defendants Blankenbeckler and Hall will not be penalized for their colleagues' oversights. Instead, respondents' negligence is imputed to Defendants only to the extent necessary to establish that Harvey's requested video "should have been preserved in the anticipation . . . of litigation" and it was "lost because a party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e).

C.     *Relevance & Prejudice*

Last, the Court must "find[] prejudice to [Harvey] from loss of the information" before it can order any remedial measures. Fed. R. Civ. P. 37(e)(1). "Generally, courts find prejudice when spoliation compromises [another] party's ability to present its case," particularly where the "party 'cannot present evidence essential to its underlying claim.'" *Knight v. Boehringer Ingelheim Pharma., Inc.*, 323 F. Supp. 3d 837, 845 (S.D. W. Va. 2018) (quoting *Victor Stanley*, 269 F.R.D. at 532). While this standard is somewhat "malleable, . . . determining whether prejudice exists given a set of facts 'necessarily [requires] an evaluation of the information's importance in the litigation.'" *Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). "But lacking a rigid definition, prejudice 'range[s] along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof.'" *Id.* (quoting *Victor Stanley*, 269 F.R.D. at 532).

Harvey claims the video was the "best and most compelling evidence of what happened" to him on June 10, 2016, because it would have shown Blankenbeckler "slamming [his] hand in the tray slot repeatedly" and Hall "denying [him] medical attention." Pl.'s Mot. 9. Harvey does not explain how he reached this conclusion. *See E.I. du Pont de Nemours*, 803 F. Supp. 2d at 498 (in the spoliation context, a party must establish relevance "by offering probative evidence, not the hyperbole of argument," that the lost materials were "likely to have been favorable to its

case"); *Sampson*, 251 F.R.D. at 180 (to establish relevance in the spoliation context, a party must show "a reasonable possibility, based on concrete evidence rather than fertile imagination, that access to the lost material would have produced evidence favorable to his cause"). Moreover, Blankenbeckler admits that he tried "several times" to close and secure the safety box's sliding door after giving Harvey his breakfast tray, Blankenbeckler Aff. ¶ 4, and Hall does not dispute that he went to Harvey's cell later in the day and "noted there was no injury done to [his] hand," Pl.'s Mot. Ex. B, at 3. Thus, the missing video's evidentiary value hinges on whether it might corroborate Harvey's allegation that his hand—not a book or some other inanimate object—was blocking the sliding door's track when Blankenbeckler tried to close the tray slot. If the jury will not be able to see Harvey's hand in the surveillance video, then not having that evidence will not hamper Harvey's ability to prove his claims for assault and battery, wanton use of excessive physical force, and deliberate indifference to his serious medical need. *See* Mem. Op. 5–11, ECF No. 25.

Of course, the parties "cannot be expected to demonstrate with certainty the content" of the deleted surveillance video. *E.I. du Pont de Nemours*, 803 F. Supp. 2d at 498–99 (brackets omitted). Investigator Fannin testified that the rapid eye video did not record audio, and that "it would not have been possible to see" inside Harvey's cell or to observe the "tray slot or the slider on the cell door" tray safety box because the surveillance camera was installed at a fixed angle near the front of the housing unit and Harvey's solid metal cell door was closed. Fannin Aff. ¶ 6. Harvey does not point to any evidence in the record that contradicts Fannin's testimony. *Cf. Ackerson*, 2018 WL 3097346, at *10 (concluding that the plaintiff failed to show her supervisor's discarded notebooks were relevant to Title VII retaliation claim where the supervisor testified, and plaintiff presented nothing to contradict his testimony, that he "would not have made notes"

13

about plaintiff's personnel complaints in the notebooks). On the record before the Court, "it would be sheer speculation to conclude" that Harvey's ability to access the lost video "would have produced evidence which a reasonable factfinder could conclude supported [his] claims" against Blankenbeckler and Hall. *Sampson*, 251 F.R.D. at 181–83.

Accordingly, Plaintiff's "Motion for Sanctions Under Fed. R. Civ. P. 37(e) for Spoliation of Evidence," ECF No. 43, must be denied. A separate order will be entered this date.

ENTER: April 22, 2019

Joel C. Hoppe
United States Magistrate Judge